Moriarty, Cornelius J., J.
INTRODUCTION
This action arises out of a disagreement among the current individual owners of various parcels making up a site (the Site) in Worcester (the City) that was leased to Burger King Corporation (BK) by the Site’s former common owner, Vargo and Associates Environmental Consulting Corporation (Vargo), over the proportion of BK’s rental payments to be distributed to each.
The plaintiff, Leon Resnick (Resnick), filed suit on November 2, 2005 against, among others, the defendants, BK and Kelly Square, LLC (Kelly). His Fourth Further Amended Complaint[4] contains the following claims against BK and Kelly: (1) request that the court declare that, by paying past rents to Kelly, BK violated an escrow agreement it entered into with Vargo and, accordingly, enter judgment against BK; (2) request that the court declare that BK’s conduct in paying past rents to Kelly and Kelly’s conduct in accepting such payments each violated G.L.c. 93A, and, accordingly, enter judgment against BK and Kelly for multiple damages and counsel fees; and (3) request that the court declare the appropriate portion of past, present, and future rents to which the parties are equitably entitled and, accordingly, order said amounts to be distributed, with that portion of present rents to which Kelly is equitably entitled being applied to satisfy its obligations with respect to past rents.
BK filed cross claims against Kelly on October 6, 2006 for, inter alia, unjust enrichment, contribution/indemnification, and misrepresentation.
This action is before the court on Resnick’s Renewed Motion for Summary Judgment on all of the claims against BK and Kelly set forth in his Fourth Further Amended Complaint, BK’s Cross Motion for Partial Summary Judgment on the aforementioned cross claims against Kelly, and Kelly’s Renewed Cross Motion for Partial Summary Judgment and Peter Silberstein’s (Silberstein) Renewed Cross Motion for Summary Judgment, both on Resnick’s claim for an equitable determination as to ownership of past, present, and future rents.
For the reasons discussed below, the court shall enter summary judgment and the declarations and injunctions as set forth in the Order below.[5]
BACKGROUND Factual Background
The Site includes parcels 1, 2, 13, 14, 15, 16, 17, 18, 20, 21, A and B,[6] all of which were, at one point, commonly owned by Vargo.
Vargo acquired: parcels 1 and 2 (the Kelly Properly), comprising 27.2% of the Site, by conveyance from Rooney Realty, Inc. on September 25, 1997; parcels 13, 14, 15, 16, 17, 18, 20, and 21 (the Resnick Property), comprising 66.3% of the Site, by conveyance from Stanley-Bostitch, Inc. (Stanley) on December 22, 1997;[7] and parcels A and B (the Silberstein Property), comprising 6.5% of the Site, via a decree of abandonment and release deed from the City on August 31, 1999.[8]
Vargo gave a mortgage to Stanley on the Resnick Property on December 31, 1997 (the Stanley Mortgage),[9] and a mortgage to Metro West Bank on the Kelly Properly on October 20, 1998 (the Metro West Mortgage). Thereafter, effective April 23, 1999, Vargo leased the Site to BK pursuant to a ground lease (the Ground Lease).
At the restaurant BK runs on the Site, part of the kitchen and part of the public seating is located on the Kelly Property. The kitchen’s emergency exit; the grease trap; the public/employee restrooms, one or more handwashing lavatories, one or more service sinks and/or curbed cleaning facilities with floor drain; and all of the restaurant’s handicapped parking spaces are situated on the Resnick Property, as are more than half of the kitchen, more than half of the public seating, and more than three-quarters of the restaurant’s regular parking spaces.[10] Although the *28 drive-through window is located on the Kelly Property, BK’s customers must drive onto the Resnick Property to access the window. The Silberstein Property contains sidewalks, curbing, landscaping, and a large pole sign advertising the restaurant. All or part of eight of the fifty-four parking spaces, required under a variance and special permit obtained by BK, are also located on the Silberstein Property.
At some point, a dispute arose between Resnick and Vargo as to the ownership of the Resnick Property. Resnick filed suit against Vargo (the Resnick Suit) and recorded a Notice of Lis Pendens on May 26, 1999.
On February 2, 2000, BK executed an amendment to the Ground Lease by which it acknowledged that it had elected to take over and complete “certain demolition and improvements,” which work had previously been the obligation of Vargo, the cost of such work to be credited against BK’s rent as it became due.
On April 26,2000, Resnick, Vargo, and BK executed an escrow agreement (the Escrow Agreement) whereby, after it completed payment for the aforementioned demolition and improvements, BK would pay rent into a trust account, rather than to Vargo, pending the outcome of the Resnick Suit.[11]
On June 16, 2000, Silberstein filed suit against Vargo. On June 29, 2000, the Boston Municipal Court granted Silberstein a writ of attachment on certain of Vargo’s real property in the amount of $88,000.00 and the property was attached the following day, June 30, 2000. On August 24, 2001, Silberstein obtained a judgment in his favor in the suit and on September 5, 2001, the Boston Municipal Court issued two Writs of Execution—one on the Resnick Property and one on the Silberstein Property—in the amount of $100,931.37. The Writs of Execution were levied upon on September 26, 2001.
On December 11, 2002, Kelly purchased the Kelly Property after Metro West Bank had foreclosed its mortgage thereon. On December 21, 2002, while BK was still paying the costs of demolition and improvements, and before any rent over and above such costs had become due, BK received a letter from Kelly (the Kelly Letter). Among other things, the Kelly Letter references Metro West Bank’s entry upon the Kelly Property for the purpose of foreclosing its mortgage and Banknorth, N.A.’s, as successor to Metro West Bank, conveyance of said property to Kelly. The Kelly Letter acknowledges BK’s rent offset, for the costs of demolition and improvements, under the Ground Lease and subsequent amendments thereto, and, finally, states: “Kelly Square LLC is now the successor landlord under the Subordination, Non-Disturbance and Attornment Agreement [described earlier in the letter as between Metro West Bank, Vargo, and BK]. . . This letter is to put you on notice that Kelly Square LLC is now the successor landlord and that when rent payments become due and payable they should be paid by checks made payable to ‘Kelly Square LLC’ mailed to the above address.”[12] Pursuant to the Kelly Letter, when BK began paying rent, it directed 100% of its rental payments for the Site to Kelly.[13] Since commencement of this suit in November 2005, BK has paid all rents into an escrow account, of which David A. Taiman and Douglas Meystre are co-trustees and escrow agents.
The Stanley Mortgage was assigned to Wyman-Gor-don Company (Wyman-Gordon) on May 21, 2003[14] Pursuant to a Judgment on Amended Motion for Assessment of Damages entered on January 22, 2004 in the Resnick Suit, Resnick became entitled to an ownership interest in the Resnick Property. Following judgment, on June 7, 2007, legal title to that property was conveyed to Resnick. The Stanley Mortgage was assigned to A.J. Properties on December 4, 2007,[15] and A.J. Properties is the current holder of the Stanley Mortgage.
Procedural Background
On October 17, 2007, Resnick filed a Motion for Partial Summary Judgment on all his claims against BK and Kelly, save for his Chapter 93A claim, Kelly filed a Cross Motion for Partial Summary Judgment, and Silberstein filed a Cross Motion for Summary Judgment. On May 29, 2009, finding that “declaratory judgment as to the rights of the respective parties is inappropriate at this time,” the Superior Court (Lemire, J.) denied all three motions.
With respect to Resnick’s motion, the court found:
[T]here is a genuine issue of material fact as to the appropriate allocation of rent payments among the interested parties. There is also a dispute as to whether Burger King’s past rent payments to Kelly Square—rather than to an escrow agent—violated an April 2000 escrow agreement to which the plaintiff and Burger King were both parties, and whether such breach makes Burger King liable to the plaintiff for a proportionate share of Burger King’s rent payments to Kelly Square prior to 11 /05. Accordingly, declaratory judgment as to the rights of the respective parties is inappropriate at this time.
With respect to Kelly’s motion, the court found that “there is a genuine issue of material fact as to the fair and proper valuation of its interest in past, present, and future rent payments made by Burger King under the lease.” With respect to Silberstein’s motion, the court found that “there is a genuine issue of material fact as to the appropriate allocation of rent payments among the interested parties.”
On December 2, 2009, intervening defendant A.J. Properties, Inc. (A.J. Properties) filed a Motion to Bifurcate Trial, to which Wyman-Gordon, BK, Kelly, and WG Washington Street, LLC assented. On January 15, 2010, the Superior Court (Tucker, J.) allowed A.J. Properties’ motion. The court’s order states, in pertinent part:
*29 The motion seeks the trial of the “Mortgage Issues,”[16] so called, and thereafter the “Rent Issues.” Some named parties have no interest in the mortgage issues or the related remediation cost issues and other parties have no interest or claim to any of the Burger King rental payments, past or future. Accordingly this matter shall be bifurcated for trial with the trial of the so called “Mortgage Issues” (including recoupment of remediation cost issues) preceding trial of the Burger King rent issues.
On May 14, 2010, Resnick filed a Renewed Motion for Summary Judgment, this time on all of the claims against BK and Kelly set forth in his Fourth Further Amended Complaint, BK filed a Cross Motion for Partial Summary Judgment on its cross claims against Kelly for unjust enrichment, contribution/indemnification, and misrepresentation, and Kelly filed a Renewed Cross Motion for Partial Summary Judgment and Silberstein filed a Renewed Cross Motion for Summary Judgment, both on Resnick’s claim for an equitable determination as to ownership of past, present, and future rents.
DISCUSSION
Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Gray v. Giroux, 49 Mass.App.Ct. 436, 438 (2000); see Mass.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of affirmatively demonstrating that there are no genuine issues of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989), and cases cited. To meet this burden, a moving party who would not bear the burden of proof at trial may either submit affirmative evidence negating an essential element of the nonmoving party’s case or show that the nonmoving party would have no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). To withstand summary judgment, the nonmoving party must articulate specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17, citing O’Brien, Russell & Co. v. LeMay, 370 Mass. 243, 245 (1976). Bare assertions or conclusions regarding an individual’s understandings and assumptions are insufficient. Polaroid Corp. v. Rollins Envtl Servs., 416 Mass. 684, 696 (1993).
I. Resnick’s Claims A. Legal Claims
1. Breach of Contract Claim Against BK
To succeed on a claim for breach of contract, a plaintiff must prove that (1) the parties entered into a valid and binding agreement, (2) the defendant breached the terms of the agreement, and (3) the plaintiff suffered damages as a result of the breach. Bowditch & Dewey, LLP v. Diecast Realty Holdings, LLC, 2007 WL 2705856 at *5 (Mass.Super. 2007) [23 Mass. L. Rptr. 25], citing Michelson v. Digital Fin. Servs., 167 F.3d 715, 720 (1st Cir. 1999) (applying Massachusetts law).
It is undisputed that BK entered into the Escrow, Agreement on April 26, 2000. Thereunder, pursuant ( to the Escrow Agreement’s plain language, BK agreed to pay any rents that became due under the Ground Lease into a trust account pending the resolution of the Resnick Suit, or, in the event it became unsure who was entitled to receive the rents or demand was made by more than one party, it could elect to deposit the rents into escrow, whether by a court interpleader action or as otherwise permitted under local law. It is also undisputed that, pursuant to the Kelly Letter, when BK began paying rent, it directed 100% of its rental payments for the Site to Kelly. Had BK deposited the rents into a trust account, the escrow agent would have been authorized to pay all proceeds of the account to Resnick as of January 22, 2004.[17] Had BK instead elected to escrow the rents and file an inter-pleader action, the rents, to which Resnick was at least partially entitled at some point, would have been preserved. As a result of BK’s payment of the rents to Kelly, however, all but a small portion of the rents have been disbursed. BK violated the Escrow Agreement by paying the rents to Kelly rather than depositing the rents into a trust account as required. Therefore, summary judgment must be allowed in favor of Resnick on his claim for breach of contract.
2. G.L.c. 93A Claims
a. Claim Against BK
Resnick contends that BK violated G.L.c. 93A by disregarding its obligations under the Escrow Agreement.[18] However, “[a] breach of contract, standing alone, is not an unfair trade practice under c. 93A. .. Instead, to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure ‘unbargained-for benefits’ to the detriment of the other party . . . The breaching party’s conduct must exceed the level of mere self-interest,... rising instead ‘to the level of ’’commercial extortion" or a similar degree of culpable conduct’ ...” (citations omitted). Zabin v. Piccioto, 73 Mass.App.Ct. 141, 169 (2008). Here, there is no evidence, nor even an allegation, that BK breached the Escrow Agreement with the intent to secure unbargained-for benefits to Resnick’s detriment. Thus, summary judgment must be granted in favor of BK on Resnick’s G.L.c. 93A claim.[19]
b. Claim Against Kelly
“(F]or a violation of G.L.c. 93A . . . , the acts or practices complained of must be perpetrated in a business context; . . . no . . . claim can be maintained if no commercial relationship—i.e., that of buyer and seller of goods or services—ever existed between the parties . ..” Steele v. Kelley, 46 Mass.App.Ct. 712, 726 (1999); see also John Boyd Co. v. Boston Gas Co., 775 F.Sup. 435, 440 (D.Mass. 1991) (the existence of some contractual or business relationship between the par *30 ties is a precursor to liability under Chapter 93A). Here, while Resnick and Kelly each own land subject to the Ground Lease, there is no evidence that they have done business with one another. As no commercial relationship exists between them, summary judgment must be granted in favor of Kelly on Resnick’s G.L.c. 93A claim.
B. Equitable Claim
1. Declaratory Judgment as to Ownership of Past, Present, and Future BK Rents
Pursuant to the Ground Lease, BK agreed to pay the landlord thereunder rent in the monthly amounts specified. Hie Ground Lease does not, however, set forth the method by which BK should distribute the rent owed among concurrent successor landlords succeeding to the ownership of portions of the Site as a result of, among other things, foreclosures of mortgages thereon. The parties dispute the proper method of distribution, and Resnick seeks a declaration by the court as to their respective rights to the rents: BK paid to Kelly between 2003 and 2005; BK has deposited in escrow since the initiation of this suit; and BK will owe in the future.
It is the shared position of both Resnick and Silberstein that all BK rents—past, present, and future—should be paid in proportion to each landlord’s percentage of ownership of the Site. Kelly, on the other hand, submits that, as the Silberstein Property is not essential to the operation of BK, and as the Resnick and Kelly Properties are equally essential, Resnick and Kelly are each entitled to half of the BK rents. Although Resnick has cited a handful of Massachusetts cases in a variety of scenarios where “pro rata” distribution was found to be the appropriate resolution, none of the parties were able to provide the court with case law precisely on point from this or any other jurisdiction.
Resnick has submitted the report of his expert, Christopher R. George (George). Based on his training and experience in the field of appraising and selling restaurants, and his consideration of the configuration of the restaurant BK runs on the Site, George concludes that because BK could operate without the drive-through window on the Kelly Property, but not without the kitchen, bathrooms, grease trap and other facilities situated on the Resnick Property, “there is no basis for paying rental income to Kelly in any amount greater than its proportionate interest in the square footage of the real estate.” In his opinion, the standard in the industry is that “the parties whose parcels of land comprise the leased premises are entitled only to a proportionate share of the rental income as related to their gross square footage real estate holdings in the aforementioned property, absent an explicit agreement to the contrary.”[20]
As the court has not been directed to any binding authority on this point, and as Kelly has not moved to strike George’s affidavit, pointed to any admissible evidence contradicting his opinion as to the industry standard, or identified any “explicit agreement to the contrary,” the court finds, as a matter of equity, that Kelly and Silberstein, whose parcels comprise a portion of the Site, are each entitled to a share of the past, present, and future rental payments in proportion to their holdings, i.e., 27.2% and 6.5%, respectively. While whichever party is deemed entitled to the rental income attributed to the Resnick Property, which issue has been reserved for trial, shall be entitled to the remaining share of 66.3% of present and future rental payments, because either Resnick or A.J. Properties has an adequate remedy at law for past rental payments, i.e., contract damages, Kelly shall be entitled to retain the remaining share of 66.3% of past rental payments.
II. BK’s Cross Claims against Kelly A. Unjust Enrichment Claim
In order to establish a claim of unjust enrichment, a plaintiff must establish three elements: “ 1) [a] benefit conferred upon the defendant by the plaintiff; 2) [a]n appreciation or knowledge by the defendant of the benefit; and 3) [t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.” Patel v. Emerald. P’ship, Ltd., 2009 WL 1058356 at *24 (Mass.Super. 2009), citing 12 Williston, Contracts §1479 (3d ed. 1957). “(M)oney voluntarily paid under a claim of right, with full knowledge of the facts on the part of the one making the payment, cannot be recovered back[, however,] unless there is fraud or concealment or compulsion by the party enforcing the claim.” Johnson v. Brockton, 8 Mass.App.Ct. 80, 82 (1979), and cases cited. “This standard applies even though no obligation to make the payment existed.” Id., citing Rosenfeld v. Boston Mut. Life Ins. Co., 222 Mass. 284, 289 (1915).
Between 2003 and 2005, under Kelly’s claim of right, BK paid Kelly 100% of the rents, although in equity, Kelly’s rightful share was only 27.2%. At the time BK made these payments, however, it had at least constructive knowledge of the fact that Kelly did not own 100% of the Site. While it is clear that Kelly and BKwere mistaken as to the legal consequences attendant to Kelly’s purchase of the Kelly Property—both believing that, by virtue of Kelly’s ownership, Kelly was entitled to the full rents provided for under the Ground Lease[21]—the summary judgment record does not appear to contain evidence that Kelly engaged in fraud,[22] concealment or compulsion. Thus, BK cannot recover these payments back, and summary judgment must be granted in favor of Kelly on BK’s cross claim for unjust enrichment.
B. Contribution/Indemnification Claim
“Contribution and indemnity are mutually exclusive remedies.” Callahan v. A.J. Welch Equip. Corp., 36 Mass.App.Ct. 608, 613 (1994), citing Elias v. Unisys Corp., 410 Mass. 479, 482 (1991).
*31 General Laws c. 23IB, the Uniform Contribution Among Tortfeasors Act, establishes the right of contribution: “where two or more persons become jointly liable in tort for the same injuiy to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them.” G.L.c. 231B, §l(a). Here, there is no evidence upon which to base joint liability of BK and Kelly in tort to Resnick. Thus, summary judgment must be granted in favor of Kelly on BK’s cross claim for contribution.
Indemnity is the right of one “who is without fault, compelled by operation of law to defend himself against the wrongful act of another, to recover from the wrongdoer the entire amount of his loss .. .” Elias, 410 Mass. at 482. But one who is not merely vicariously liable, but is liable due to his own fault, has no such right. Economy Eng’g Co. v. Commonwealth, 413 Mass. 791, 793-94 (1992). Here, the court has determined that BK is directly liable to Resnick for violating the Escrow Agreement. As a result, summary judgment must be granted in favor of Kelly on BK’s cross claim for indemnification.
C. Misrepresentation Claim
BK contends that the Kelly Letter constitutes or contains an actionable misrepresentation. The Kelly Letter states: “Kelly Square LLC is now the successor landlord under the Subordination, Non-Disturbance and Attornment Agreement [described earlier in the letter as between Metro West Bank, Vargo, and BK]... This letter is to put you on notice that Kelly Square LLC is now the successor landlord and that when rent payments become due and payable they should be paid by checks made payable to ‘Kelly Square LLC’ mailed to the above address.”
To succeed under either theoiy of misrepresentation, intentional or negligent, BK must establish that the representation upon which it relied was false. Kilroy v. Barron, 326 Mass. 464, 465 (1950), and cases cited; Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 19-20 (1998), citing Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587-88 (1996).
Under the circumstances of this case, the only statement that could reasonably constitute a misrepresentation is: “Kelly Square LLC is now the successor landlord under the Subordination, Non-Disturbance and Attornment Agreement [described earlier in the letter as between Metro West Bank, Vargo, and BK]. .. This letter is to put you on notice that Kelly Square LLC is now the successor landlord.[23] The undisputed facts establish that: (1) Vargo gave a mortgage to Metro West Bank on the Kelly Property on October 20, 1998; (2) thereafter, effective April 23, 1999, Vargo leased a site, containing, among others, the Kelly Property, to BK pursuant to a ground lease; and (3) on December 11, 2002, Kelly purchased the Kelly Property after Metro West Bank had foreclosed its mortgage thereon. Although the actual Subordination, Non-Disturbance and Attornment Agreement referenced is not part of the summary judgment record, the court can infer from these facts, as well as from the plain meaning of the terms, that Kelly, as a party succeeding to the ownership of the Kelly Properly as a result of foreclosure of the Metro West Mortgage, was a successor landlord thereunder. Thus, BK will be unable to prove that the statement: “Kelly Square LLC is now the successor landlord under the Subordination, Non-Disturbance and Attornment Agreement [described earlier in the letter as between Metro West Bank, Vargo, and BK] . . . This letter is to put you on notice that Kelly Square LLC is now the successor landlord,” was false. Therefore, summary judgment must be granted in favor of Kelly on BK’s cross claim for misrepresentation.
ORDER
For the foregoing reasons, it is hereby ORDERED that summary judgment is ALLOWED in favor of Resnick on his claim for breach of contract against BK, GRANTED in favor of BK on Resnick’s claim of violation of G.L.c. 93A against BK, GRANTED in favor of Kelly on Resnick’s claim of violation of G.L.c. 93A against Kelly, and GRANTED in favor of Kelly on BK’s cross claims for unjust enrichment, contribution/indemnification, and misrepresentation.
Declarations shall enter that Silberstein is equitably entitled to 6.5% of the past, present, and future rental payments; Kelly is equitably entitled to 93.5%[24] of past and 27.2% of present and future rental payments; and whichever party, as between Resnick and A.J. Properties, is ultimately deemed entitled to the rental income attributable to the Resnick Property, shall be equitably entitled to the remaining 66.3% of present and future rental payments.
In accordance with the declarations set forth herein, Kelly is hereby ordered to make restitution to the extent it was unjustly enriched by the rental payments it received from BK between 2003 and 2005, i.e., to Silberstein in the amount of 6.5% of past rental payments. However, because Kelly has conceded that all but a small portion of these funds have already been disbursed, Kelly’s obligation to make restitution shall be satisfied out of its 27.2% share of present rental payments (and, to the extent necessary, future rental payments), with the balance remaining thereafter being paid to Kelly. The non-Kelly shares of present and future rental payments are to be distributed as follows: 6.5% is to be paid to Silberstein and 66.3% is to be deposited in escrow for whichever party is ultimately deemed entitled to the rental income attributable to the Resnick Properly.

Notwithstanding the fact that Resnick obtained leave of the court to file, and did file, a Fifth Further Amended Complaint, adding a claim against BK, before filing his Renewed Motion for Summary Judgment, he specifically moves for summary judgment on all claims against BK and Kelly “as set forth in his Fourth Further Amended Complaint.”

Resnick and A.J. Properties also move, jointly, to strike portions of the affidavit supplied by Gregg Lisciotti (Lisciotti) of Kelly. In his affidavit, Lisciotti offers the opinion that the rents should be divided based on the value each parcel brings to BK’s venture. In paragraphs 17 and 19 of the affidavit, Lisciotti explains his qualifications and the evidence upon which he ultimately bases his conclusion. Concerning his qualifications, Lisciotti explains that he has experience and considers himself an expert in commercial real estate development. He does not, however, say anything about his qualifications in the area of valuation. Concerning the evidence upon which he bases his conclusion, Lisciotti explains that he had a conversation with an unnamed expert concerning the percentage of revenue the drive-through window generates. As Lisciotti has failed to set forth sufficient qualifications to support his opinion concerning how to divide the rents and has based that opinion on inadmissible hearsay, the motion to strike paragraphs 17 and 19 of Lisciotti’s affidavit is ALLOWED.

The Summary Judgment Record alternately refers to parcels A and B as parcels 24 and 25.

These parcels constituted a portion of the land conveyed by Stanley-Bostitch, Inc. to Vargo by deed dated December 22, 1997.

These parcels constituted a portion of the land Vargo acquired from the City on August 31, 1999.

he Stanley Mortgage, which secures, among other things, Vargo’s performance of an Environmental Compliance and Indemnity Agreement dated December 31, 1997, contains an Assignment of Rents provision. This provision provides, in relevant part: “Mortgagor has absolutely and unconditionally assigned and transferred, and Mortgagor hereby assigns and transfers, to Mortgagee all of Mortgagor’s right, title and interest in and to the leases of the Property and the rents and profits therefrom, provided that Mortgagor shall be entitled to retain such rents and profits as trustee for the benefit of Mortgagee until and Event of Default shall have occurred.”

The grease trap is required by City Ordinance. The toilets, handwashing lavatory and service sink and/or a curbed cleaning facility with floor drain are essential features required to conduct business under the Massachusetts Sanitary Code. For all practical purposes, the kitchen, public seating and parking are essential for BK to conduct its usual business operations.

 JThe Escrow Agreement explicitly states that “all parties to this Agreement acknowledge and agree that if Burger King Corporation is ever unsure of what party or parties are entitled to receive the rents due under the Lease, or if more than one party demands the rents, Burger King Corporation may elect to pay the rents into escrow, whether by a court interpleader action or as otherwise permitted under local law, and that such payments shall satisfy its obligations under the Lease and this Agreement.”

Lisciotti’s affidavit states that he thought that Kelly was entitled to the rent under the Ground Lease because he “believed the parcels [Kelly! bought had the assignment of rent and the lease as terms of the mortgage.”

BK and Kelly dispute the month in which BK began making rental payments and, therefore, the total amount of rent paid to Kelly before the institution of the instant suit. BK claims that it began making payments to Kelly in February 2003 and paid a total of $224,099.27. Kelly, on the other hand, claims that BK did not start making payments to it until May or June 2003 and paid a total of $217,673.27. In any event, Kelly’s attorney has stated, in open court, that Kelly has disbursed whatever rent payments it received from BK.

In conjunction with its assignment of the Stanley Mortgage, Stanley also assigned to Wyman-Gordon its claims under the Environmental Compliance and Indemnify Agreement.

In conjunction with its assignment of the Stanley Mortgage, Wyman-Gordon also assigned to A.J. Properties its claims under the Environmental Compliance and Indemnity Agreement. In a January 3, 2008 Notice of Default and Demand for Reimbursement addressed to Vargo and Resnick, A.J. Properties alleged that Vargo had breached the Environmental Compliance and Indemnity Agreement, and that such breach had put Vargo in default under the Stanley Mortgage. A.J. Properties then made “demand ... for a written release of all of Mortgagor’s right title and interest in and to the leases of the Property and the rents and profits therefrom until [Vargo’s] debt[, which had accrued, by agreement of the parties, as a consequence of the breach, was] satisfied.”

The “Mortgage Issues” to be decided include whether A.J. Properties, as holder of the Stanley Mortgage, is entitled to a portion of the BK rents by virtue of the “Assignment of Rents” provision therein or whether, as Resnick claims, the Stanley Mortgage ought to be discharged.

The Escrow Agreement states: “Escrow Agent is authorized to pay all proceeds out of the escrow account pursuant to the terms of any settlement agreement or judgment resolving the pending Litigation.” Resolution of the Resnick Suit came on January 22, 2004 in the form of a Judgment on Amended Motion for Assessment of Damages by which Resnick became entitled to an ownership interest in the Resnick Property. Title to that property was conveyed to Resnick thereafter on June 7, 2007.

Under G.L.c. 93A, the unfair act or practice must cause the plaintiffs injury. Here, it was BK’s breach of contract that caused Resnick’s injury. To the extent that Resnick contends that BK’s unfair act was failing to investigate Kelly's purported entitlement to 100% of the rents, such claim merely establishes why BK breached the contract, not the cause of Resnick’s injury.

“Summary judgment, when appropriate, may be rendered against the moving party.” Mass.R.Civ.P. 56(c).

As addressed in note 5 above, although Kelly has submitted an affidavit in support of its position that Resnick and Kelly are each entitled to half of the BK rents, the court has stricken the affidavit’s conclusions to that effect.

 Although BK disputes that Lisciotti thought Kelly was entitled to the rent under the Ground Lease, asserting that discovery is required to ascertain this fact, discovery in this matter has been closed since December 31, 2009 according to the docket.

See the court’s discussion of BK’s cross claim for misrepresentation below.

As it is in the nature of a request, the statement: “when rent payments become due and payable they should be paid by checks made payable to ‘Kelly Square LLC’ mailed to the above address,” cannot be characterized as true or false.

This figure includes past rental payments in proportion to Kelly’s holdings, i.e., 27.2%, as well as the remaining 66.3% of past rental payments as either Resnick or A.J. Properties has an adequate remedy at law, i.e., contract damages, and BK cannot recover any of the money it paid to Kelly under the voluntary payment doctrine.